UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


MARGARITA ALEKSANDROV
SOKOLOVSKAYA,
       Plaintiff,


      v.                                CIVIL ACTION NO. 15-13412-MPK[1]


CAROLYN W. COLVIN,
       COMMISSIONER[2] OF THE
       SOCIAL SECURITY ADMINISTRATION,
       Defendant.


MEMORANDUM AND ORDER ON
MOTION FOR AN ORDER REVERSING COMMISSIONER'S DECISION (#14)
AND DEFENDANT'S
MOTION TO AFFIRM THE COMMISSIONER (#16).


KELLEY, U.S.M.J.

## I. INTRODUCTION.

Plaintiff Margarita Aleksandrov Sokolovskaya seeks reversal of the decision of Defendant

Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, denying her

disability insurance benefits ("DIB") under the Social Security Act. Defendant moves for an order

affirming the Acting Commissioner's decision. With the administrative record (#13) having been

filed and the issues fully briefed (##15, 17, 18), the cross motions stand ready for decision.

---

[1]
      With the parties' consent, this case has been reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#21.)

[2]
      This is a misnomer because, although nominated to be the Commissioner of the Social Security Administration, to date Carolyn W. Colvin remains the Acting Commissioner.

## II. BACKGROUND.

### A. Procedural History.

Sokolovskaya filed for DIB on September 14, 2012 with an alleged disability onset date of April 30, 2012. (TR[3] at 20.)  Her claim was denied at the agency level and Plaintiff requested a hearing before an administrative law judge, which was held on June 11, 2014. (TR at 20.) Sokolovskaya appeared at the administrative hearing with her legal representative. (TR at 20.)  Both she and a vocational expert testified before ALJ Paul Carter. (TR at 20.)

In his June 24, 2014 decision, ALJ Carter determined that Sokolovskaya was not under a disability as defined by the Social Security Act from September 14, 2012 through June 24, 2014. (TR at 10.)  The Appeals Council denied Plaintiff's request for review (TR at 1-6) which effectively rendered ALJ Carter's decision to be the final decision of the Acting Commissioner.  Sokolovskaya then filed this civil action under 42 U.S.C. § 405(g).

### B. Factual History.

1. Personal History.

Sokolovskaya was born on September 8, 1957 in the Ukraine and was fifty-six years of age when ALJ Carter issued his decision. (TR at 27, 43-4.)  She was also educated in the Ukraine, graduating from "eight-year school," and then attending "college" for four years where she studied radio electronics. (TR at 45.)  Sokolovskaya is fluent in Russian and Ukraine.[4] (TR at 45.)  She has

---

[3]

      The designation "TR" refers to the administrative record. (#13.)

[4]

      Plaintiff testified that she started studying English when she came to the United States, and that she can read simple sentences, but not longer ones. (TR at 46.)  According to her attorney, Sokolovskaya can speak rudimentary English. (TR at 37.)  She had an interpreter at the administrative hearing; some questions Plaintiff was able to answer in English herself, and in other instances she needed the aid of the interpreter.

lived in the United States since 1996. (TR at 44.)  Plaintiff is married and has two children. (TR at 44.)  Her past relevant work was as a data entry clerk, a job at which she worked for fourteen years. (TR at 27, 47, 61.)

At the administrative hearing, Sokolovskaya testified that she lies down during the day, every day, but she does not sleep. (TR at 50-1.)  When she is in "bad condition," Plaintiff stays at home and sometimes spends the whole day in bed to hide from everyone. (TR at 51.)  If she is in "good condition," her husband will take her shopping. (TR at 51.)   When in "good condition," Plaintiff will go out by herself, taking half-hour walks. (TR at 53-4.)  She cooks maybe one day a week, and her husband does the rest. (TR at 51.)

Sokolovskaya claims she can read for only five or ten minutes because she is unable to focus her attention. (TR at 51.)  Likewise, her television watching is limited to ten minutes at a time. (TR at 52.)   Plaintiff uses a computer to get the weather; she does not have e-mail. (TR at 52.)  Sokolovskaya described herself as a "very sensitive" person who feels as though she is being watched, and feels guilty when people look at her. (TR at 54.)  She testified that she has difficulty meeting new people, and socializes only with her husband and sons. (TR at 55.)  Sokolovskaya spends time with her grandson. (TR at 57-8.) When she is under stress, she gets terrified and begins to cry. (TR at 55.)

Plaintiff is able to understand and remember very short and simple instructions. (TR at 55-6.) Sokolovskaya claims that she has difficulty asking questions, performing activities within a schedule or maintaining regular attendance and being punctual. (TR at 56.)

2. Medical History.

The medical evidence begins with an April 4, 2012 record from Max Baranovsky, M.D.,

Plaintiff's then treating psychiatrist. (TR at 338.)  Because Dr. Baranovsky's handwritten treatment notes covering the period from April through June, 2012 are essentially illegible, he provided copies of those notes with statements numbered together with a numbered list to clarify the entries. (TR at 330-38.)   Records for five appointments are included with that time frame, one half hour appointment on April 30, 2012 for psychotherapy, and four fifteen minute appointments for pharmacologic management. (TR at 334-38.)  These treatment notes and the key provided by Dr. Baranovsky reveal that the doctor recorded Plaintiff's subjective reports,[5] objectively noted that Plaintiff was consistently oriented times three, and opined that she was disabled due to her persistent depression. (TR at 331-38.)  Her medications were Zoloft and Buspar. (TR at 334-38.)  In a June 27, 2012 letter, Dr. Baranovsky opined that Sokolovskaya would be unable "to resume work on July 9, 2012 due to continued disability." (TR at 339.)  In an attending physician's statement to an insurance claims department in August 2012,  Dr. Baranovsky  opined that Plaintiff was disabled due to major depressive disorder. (TR at 330.)

Dr. Baranovsky's next progress note is dated January11, 2013 for a ten minute appointment. (TR at 355.)  The reason for the appointment was Plaintiff's continued anxiety. (TR at 355.)  In the review of systems, Dr. Baranovsky described Plaintiff as remaining anxious, unsure of herself, expressing self-devaluation and having impaired concentration. (TR at 355.)  Her assessment was major depression, single episode NOS, with Dr. Baranovsky opining that Sokolovskaya was disabled and that she should continue psychotherapy and medications. (TR at 355.)

The reason for a fifteen minute appointment on January 28, 2013, was that Plaintiff was tired

---

[5] During this period Plaintiff reported being tired, frightened, having poor concentration and losing interest. (TR at 331-38.)

and frightened. (TR at 354.)  A review of her mental status showed that Sokolovskaya was oriented times four; she had poor eye contact and was withdrawn; her behavior was avoidant; her motor was slow; her speech was soft; her affect/mood was depressed, distressed and frustrated; her thought content was complaining; her judgment, insight, attention/concentration and memory were all listed as poor. (TR at 354.)  Her relevant history included continued anxiety, fear, lack of concentration, poor memory and self-devaluation. (TR at 354.)  Dr. Baranovsky assessed Plaintiff with depression. (TR at 354.)

Sokolovskaya's next treatment note is dated four months later on April 22, 2013. (TR at 346.)  Plaintiff reported continued depression, insomnia, anxiety, the desire to hide from people and not wanting to meet people. (TR at 346.)  Sokolovskaya related she could not read for more than fifteen minutes, she did not know how to relate to people and she felt that her memory was declining. (TR at 346.)  With respect to her mental status, Dr. Baranovsky noted that Plaintiff was oriented to place, time and herself, her speech was coherent with no aphasia, her mood was depressed, her expression was self-devaluation and she was frightened of the future. (TR at 346.)  Sokolovskaya had no hallucinations or delusions or any suicidal ideation. (TR at 346.)  The doctor's clinical impression was major depressive disorder, disabled. (TR at 346.)  Plaintiff's treatment plan was to continue supportive psychotherapy and her medications, Zoloft and Buspar.(TR at 346.)

At a June 4, 2013 follow-up visit, Plaintiff reported transient insomnia, increased anxiety, lack of concentration and fear of the future. (TR at 345.)  A recent stressor was the death of her mother. (TR at 345.)  Dr. Baranovsky opined that Sokolovskaya remained disabled and was to continue psychotherapy and medications. (TR at 345.)  The following month, although Plaintiff was compliant in taking her medications, she still felt apathetic particularly in the morning, she could

not force herself to do things throughout the day, she was frightened of the future and her concentration remained poor. (TR at 344.)  Dr. Baranovsky noted that there were no psychotic features and no features of dementia, and that Plaintiff would continue on the same psychotherapy and medication regime. (TR at 344.)

On August 13, 2013, Dr. Baranovsky completed a Psychiatric Disorder Questionnaire with respect to Plaintiff. (TR at 347.)  He listed Sokolovskaya's diagnosis as major depression with a Global Assessment of Functioning ("GAF") score of 30. (TR at 347.)   The doctor described Plaintiff's adaptive functioning as withdrawn and isolated; her concentration and attention were noted to be impaired, and she was unable to focus; her memory was said to be compromised; she was forgetful and unable to take initiative; when dealing with others she was withdrawn and hostile; she was compromised and prone to phobias when traveling in public; and regarding routine stress, she was avoidant with depression. (TR at 347-48.)  Dr. Baranovsky stated that Sokolovskaya's medications were Zoloft and Buspar, and that he saw her on a monthly basis. (TR at 349.) According to Dr. Baranovsky, Plaintiff's prognosis was poor. (TR at 349.)

At a September 12, 2013 appointment, Plaintiff related that she felt discouraged. (TR at 353.) Again, there was expression of self-devaluation, Sokolovskaya was frightened about the future and she had poor concentration. (TR at 353.) Dr. Baranovsky found her to be oriented to time, place and herself, her speech was coherent, she had no persecutory delusions and no suicidal or homicidal ideation. (TR at 353.)  Plaintiff's medication was continued and she was referred for followup. (TR at 353.)

Sokolovskaya had an appointment Cynthia Carter, M.D., on October 16, 2013 for a

medication refill.[6] Dr. Carter noted that Plaintiff had been on the same medications for fifteen years and that she was doing well on them. (TR at 374.)  Sokolovskaya had come to the appointment alone, was less depressed and had been spending time with her grandson. (TR at 374.)  Dr. Carter observed that Plaintiff smiled easily and there was no crying. (TR at 374.)  Plaintiff expressed worry about being denied disability benefits, but denied any other symptoms. (TR at 374.)

The next visit with Dr. Carter was on November 13, 2013. (TR at 371.)  Plaintiff advised that she was feeling a bit better, although she could still feel down. (TR at 371.)  While she tried to be happy, it was difficult sometimes, and she still felt hopeless and empty once in a while. (TR at 371.)  She expressed continued worry about her disability benefits. (TR at 371.)   Upon physical examination, Dr. Carter found Plaintiff to be alert and in no emotional distress. (TR at 372.)  She had appropriate eye contact and was oriented to person, place and time. (TR at 372.)  Sokolovskaya's communication ability was within normal limits, her memory and insight were intact, and her attention and concentration abilities were normal. (TR at 372.)  Plaintiff's attitude was cooperative, engaged, friendly and pleasant while her mood was sad and incongruent. (TR at 373.)   No other psychiatric difficulties of any kind were noted. (TR at 371-73.) Dr. Carter determined that Sokolovskaya was not improving on her current medications and Plaintiff agreed to add a low dosage of Wellbutrin. (TR at 371.)

At a December 11, 2013 visit, Plaintiff reported that Wellbutrin made her dizzy so she stopped taking it, and she preferred to stay with her longstanding medications. (TR at 368.)  Dr. Carter observed that Sokolovskaya was doing well on her current medication and she formally withdrew the Wellbutrin. (TR at 368.)  Plaintiff expressed continued anxiety about her pending

---

[6]

       Dr. Baranovsky moved, so Plaintiff began seeing a new psychiatrist. (TR at 59.)

disability application. (TR at 368.)  Dr. Carter's findings on physical examination were the same as those on November 13, 2013 except that Plaintiff's mood was now normal and her affect appropriate. (TR at 369.)

Sokolovskaya reported no current stressors at her January 9, 2014 appointment with Dr. Carter. (TR at 365.)  Once again, Plaintiff was noted as doing well on her current medications. (TR at 365.)  Dr. Carter's observations on physical examination were identical to those at the prior appointment, including that Plaintiff's mood was normal and her affect appropriate. (TR at 365-66.)

The next Progress Note is dated March 11, 2014. (TR at 362.)  Sokolovskaya complained that she had felt empty inside for the past two weeks and she was not sleeping well. (TR at 362.) Plaintiff was concerned about the loss of a front tooth, and she also expressed concern about issues in Crimea. (TR at 362.)  Despite her complaints, Dr. Carter observed that she smiled brightly and her fingernails were polished for the first time; Dr. Carter thought she was quite bright compared to times when she had seen her depressed. (TR at 362.)  Sokolovskaya thought she would feel better when the weather improved. (TR at 362.)  Dr. Carter and Plaintiff discussed different medications, but Sokolovskaya resisted any changes in her regime. (TR at 362.)  Once again Dr. Carter made the same observations on physical examination, including that Plaintiff's mood was normal and her affect appropriate. (TR at 362-63.)

At her April 16, 2014 appointment, Plaintiff reiterated that she felt empty inside, that she felt self conscious about having lost her tooth and that she was concerned about her upcoming disability hearing. (TR at 359.)  Dr. Carter recorded that Sokolovskaya was doing well on her current medications. (TR at 359.)  The same observations were made on physical examination as had been made since December 2013. (TR at 359-60.)

Sokolovskaya had an appointment with Dr. Carter on May 7, 2014. (TR at 356.)  Plaintiff had been in an auto accident two months prior but, despite physical therapy, the pain was worse; she was tearful when discussing the pain. (TR at 356.)  Sokolovskaya explained that the one year anniversary of her mother's death was upcoming, she was worried about her disability hearing and was also concerned about the situation in the Ukraine. (TR at 356.)  Plaintiff stated that she was not sleeping well. (TR at 356.)  Dr. Carter prescribed valium in the hopes of reducing the back pain. (TR at 356.)  Plaintiff was noted to be doing well on her regular medications. (TR at 356.)  On examination, Dr. Carter made the same observations that she made at the last five appointments, including that Sokolovskaya grossly oriented to person, place and time, her attention and concentration abilities were normal, her attitude was engaged, cooperative, friendly and pleasant, her mood was normal and her affect appropriate. (TR at 356-57.)

3. Medical Opinions.

On April 9, 2013, Peter E. Yaffe, Ph.D., a clinical psychologist, conducted a Clinical Diagnostic Interview with Sokolovskaya. (TR at 340-43.)  In his report, Dr. Jaffe reviewed the subjective information provided by Plaintiff. (TR at 340-43.)  He did not undertake a mental status examination or make any objective observations. (TR at 340-43.)

Plaintiff's chief complaint was depression. (TR at 340.)  She related that her problems began when she had a panic attack at work two years before; she had to leave work and go home. (TR at 340.)  When her doctor advised her by telephone that day that her symptoms were classic for a panic attack, she nevertheless took short term disability for three months. (TR at 340.)  Sokolovskaya had a second panic attack while she was doing data entry at work approximately one year later. (TR at 340.)  Based on her prior experience, she knew she was having a panic attack so did not feel the need to go home. (TR at 340.)  However,  over time she became anxious about having another attack

and developed a phobia about going to work. (TR at 340.)  Sokolovskaya told Dr. Jaffe that during

the fourteen years she had worked as a data entry clerk, her duties had changed and electronic

technology started being implemented making her job more stressful. (TR at 2.)  She was not

sleeping, crying and depressed, so she went to see the doctor. (TR at 340.)  Plaintiff then went out

on long term disability. (TR at 340.)  Since leaving work she had had no panic attacks, and did not

worry about them. (TR at 340.)

Sokolovskaya reported to Dr. Jaffe that she had difficulty sleeping and sustaining attention

on task for longer than ten or fifteen minutes. (TR at 342.)  Plaintiff said she was so depressed at

times that she could not do anything, and she avoided speaking to people because after such

interaction she felt a profound sense of emptiness. (TR at 342.)  She worried about the inheritability

of her mother's schizophrenia for herself, her children and grandchildren. (TR at 342.)  With respect

to activities, Sokolovskaya typically went for a walk in the morning, she was friendly with one

Russian couple, and she went shopping with her son, although she was uncomfortable if the store

was crowded. (TR at 342.)  She said she was unable to handle her own finances. (TR at 342.)

In his summary, Dr. Jaffe wrote Plaintiff had problems with attention and concentration, and

reportedly had suicidal ideation without intent. (TR at 343.)  She had made no suicide attempts or

had any psychiatric hospitalizations. (TR at 343.)  Sokolovskaya was said to have restrictions on

activities of daily living and difficulties in maintaining social functioning. (TR at 343.)  Dr. Jaffe

diagnosed her with panic disorder with agoraphobia in partial remission, specific phobia, and major

depressive disorder, recurrent, moderate. (TR at 343.)  He assessed Plaintiff with a GAF score of

50. (TR at 343.)

On June 18, 2013, Joseph A. Whitehorn, Ph.D., reviewed the evidence of record to date

including Dr. Baranovsky's treatment notes through June 2012 and Dr. Jaffe's report. (TR at 74-78.)

10

Based on his review, Dr. Whitehorn made an assessment of Sokolovskaya wherein he opined that she had moderate restrictions of activities in daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (TR at 78.)   Based on these findings, Dr. Whitehorn completed a mental residual functional capacity assessment where he opined as follows: Plaintiff had memory and understanding adequate for simple tasks; she could sustain pace and focus on simple tasks for two hour periods during a work day; she could be somewhat withdrawn and difficult to engage in workplace interactions but nevertheless could manage to adhere to social norms; and she could handle changes in simple work routines. (TR at 79-81.)

On August 23, 2013, Patricia Duffy, Psy.D., considered an expanded record and made an assessment of Plaintiff that echoed that of Dr. Whitehorn. (TR at 85-90.)   Dr. Duffy completed a mental residual functional capacity assessment in which she opined as follows: at a minimum Sokolovskaya is able to understand and remember simple instructions; maintain attention, concentration, persistence and pace to carry out simple tasks for two hour periods during a forty hour work week; manage appropriate, superficial, interpersonal interactions; and cope with minor changes in work routines, avoid hazards, travel independently, and make/carry out simple plans. (TR at 91-3.)

## III. THE STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the

> record, a judgment affirming, modifying, or reversing the decision of
> the Commissioner of Social Security, with or without remanding the
> cause for a rehearing. The findings of the Commissioner of Social
> Security as to any fact, if supported by substantial evidence, shall be
> conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless
> 'the Secretary has committed a legal or factual error in evaluating a
> particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct.
> 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of
> fact are conclusive if supported by substantial evidence. *See* 42
> U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401,
> 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996); *Hill v.

Colvin*, No. CIV. A. 13-11497-DJC, 2015 WL 132656, at *2 (D. Mass. Jan. 9, 2015).

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.

v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955

F.2d 765, 769 (1st Cir. 1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in
> mind that 'issues of credibility and the drawing of permissible
> inference from evidentiary facts are the prime responsibility of the
> Secretary.' The Secretary may (and, under his regulations, must) take
> medical evidence. But the resolution of conflicts in the evidence and
> the determination of the ultimate question of disability is for him, not
> for the doctors or for the courts. We must uphold the Secretary's
> findings in this case if a reasonable mind, reviewing the record as a
> whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting

*Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)).  In other

words, if supported by substantial evidence, the Commissioner's decision must be upheld even if

the evidence could also arguably admit to a different interpretation and result. *See Ward v. Commissioner of Social Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); *Viveiros v. Astrue*, No. CIV. A. 10-11405-JGD, 2012 WL 603578, at *5 (D. Mass. Feb. 23, 2012).  Finally,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs*., 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) (citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [(D. Mass.1980)]), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001); *Roshi v. Comm'r of Soc. Sec*., No. 14-10705-JGD, 2015 WL 6454798, at *5 (D. Mass. Oct. 26, 2015).

## IV. DISCUSSION.

In order to qualify for DIB, a claimant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Title 42 U.S.C. § 423(d)(1)(A).   In making the decision to deny Plaintiff's request for DIB, the ALJ conducted the familiar five step sequential evaluation process to determine whether an adult is disabled.  *See* 20 C.F.R. § 404.1520(a); *Goodermote v. Secretary of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982); *Veiga v. Colvin*, 5 F. Supp.3d 169, 175 (D. Mass. 2014).  ALJ Carter concluded that: 1) Plaintiff met the insured status of the Social Security Act through December 31, 2017; 2) Plaintiff had not engaged in substantial gainful activity since April 30, 2012, the alleged onset date; 3) Plaintiff has the following severe impairments: major depressive disorder and anxiety; 4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

list impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; 5) Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff is restricted to performing no more than simple 1-4 step repetitive tasks; she cannot perform complex tasks; she can work with or without supervision, but cannot perform work in tandem with coworkers; she should not provide or receive information from the public, but could have momentary casual contact with the general public; 6) Plaintiff is unable to perform any past relevant work; 7) Plaintiff was born on September 8, 1957 and was 54 years old[7] on the alleged disability onset date; 8) Plaintiff has at least a high school education and is able to communicate in English; 9) transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable skills; 10) considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and 11) Plaintiff has not been under a disability, as defined in the Social Security Act, from April 20, 2012, through June 24, 2014, the date of the ALJ's decision.

Sokolovskaya takes issue with the ALJ's decision.  At the outset, she argues that ALJ Carter failed to offer good reasons for rejecting the opinion of her treating psychiatrist, Dr. Baranovsky.[8]

---

[7]

A 54 year old is defined as an individual closely approaching advanced age.

[8]

Despite Plaintiff's suggestion to the contrary, it is clear from his decision that ALJ Carter acknowledged Dr. Baranovsky was her treating psychiatrist and considered his treatment notes. (TR at 25-7.) *See*, e.g., *Green v. Astrue*, 588 F. Supp.2d 147, 155 (D. Mass. 2008) ("Although it would have been desirable for the hearing officer to have referred to Green's psychological 'treating physician' in explicit detail, his decision and reasoning are sufficiently clear and, even if he did not address every factor suggested by the statute, substantial evidence supports his decision.").

The law is clear that

> An ALJ must always consider the medical opinions in [the]
> case record, . . . and SSA regulations prioritize the opinions of a
> claimant's treating sources. The treating source rule provides that the
> ALJ should give more weight to the opinions of treating physicians
> because these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations.
> Controlling weight will be given to a treating physician's opinion on
> the nature and severity of a claimant's impairments if the opinion is
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the other
> substantial evidence in the record.

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (internal citations and quotations marks omitted). With that said, there is no question that the ALJ may rely on reports from non-treating physicians when they are more consistent with the record than reports provided by treating physicians. *See Berrios–Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir.1991); *DiVirgilio v. Apfel*, 21 F. Supp.2d 76, 80–81 (D. Mass.1998). The standard with respect to the evaluation of evidence as it relates to a treating physician's opinion bears repeating: "Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the Court, to resolve." *Abubakar v. Astrue*, No. 11–cv–10456–DJC, 2012 WL 957623, at *8 (D. Mass. Mar.21, 2012) (internal citations omitted).

ALJ Carter afforded little weight to Dr. Baranovsky's opinion that Sokolovskaya was totally disabled,[9] determining that the opinion was unsupported by substantial evidence and not well-

---

[9]

    ALJ Carter noted that "[a] treating source's opinion that a claimant is disabled does not direct a finding of disability under the rules and regulations of the Social Security Act, as this is a decision reserved to the Commissioner; however, the opinion must be considered and a finding made regarding the extent to which it is supported by the record (20 CFR 404.1527(e)(1) and 416.927(e)(1); SSR 96-5p)." (TR at 26.)

supported by the medical evidence.  The ALJ concluded that Dr. Baranovsky's opinion was not justified by the course of treatment Plaintiff received, most notably the lack of counseling and the absence of any emergency room visits or hospitalizations.[10]  Sokolovskaya contends that the record reflects that her psychiatrists provided counseling and psychotherapy.

It is true that there is a hand-written note on a fax cover sheet from Dr. Baranovsky in the record where he stated that psychotherapy was included in his meetings with Sokolovskaya. (TR at 329.)  For the most part, however, that statement is belied by his contemporaneous records.  For example, in the five appointments from April through June, 2012, only one half hour appointment is recorded as being for psychotherapy, while the other four fifteen minute appointments are noted to be for pharmacologic management. (TR at 334-38.)   Similarly, Plaintiff's January 11 and 28, 2013 appointments were for ten and fifteen minutes respectively. (TR at 354-55.)  The remainder of her appointments were months apart. (TR at 345-47, 353.)  Even assuming that Plaintiff was receiving psychotherapy from Dr. Baranovsky, based on the appointment records that counseling would have occurred on an erratic basis and the sessions were very limited in length, the longest being thirty minutes.  The ALJ was entitled to rely on Dr. Baranovsky's contemporaneous records in finding that Sokolovskaya was not receiving regular counseling.

Dr. Carter's notes do not indicate that she was conducting psychotherapeutic sessions with Plaintiff.  Rather, each appointment reflects that the purpose of the visit was to refill medications or med management. (TR at 356, 359, 362, 365, 368, 371, 374.) While the progress notes in two instances state that support was offered by Dr. Carter to Sokolovskaya, there is no indication that the proffered "support" was psychotherapy or counseling of any substance. (TR at 356, 359.)

---

[10]

Plaintiff does not contend that the ALJ erred in finding no emergency room visits or hospitalizations.

Plaintiff next suggests that the ALJ did not consider that her limited English language skills may have affected her ability to receive counseling.[11]  There is no evidence in the record to show that either Dr. Baranovsky or Dr. Carter had any language barrier with Sokolovskaya.  In any event, based on the medical records, neither treating psychiatrist appeared to view Plaintiff's depression to be of such a nature that regular counseling was required.  Neither psychiatrist provided it, and there is no evidence in the record indicating that Plaintiff sought such help.

The treatment notes from Dr. Baranovsky and Dr. Carter, together with the absence of medical records from any other treating psychiatrist or psychologist, provide substantial evidence supporting ALJ Carter's conclusion that Plaintiff was not receiving regular counseling for her depression.

In giving little weight to Dr. Baranovsky's opinion that Plaintiff was disabled,[12] ALJ Carter also  observed that her course of treatment was routine. (TR at 26.)  Relying on Dr. Carter's medical records[13] which were subsequent to those of Dr. Baranovsky, the ALJ found that Sokolovskaya's treatment had been effective. (TR at 26.)  ALJ Carter determined that "[m]ental examinations show that she is oriented,[14] engaged, friendly, and pleasant, with essentially normal thought processes,

---

[11]
 This assertion undercuts Plaintiff's prior argument that she did, in fact, receive counseling.

[12]
 It is important to bear in mind that while ALJ Carter discounted Dr. Baranovsky's opinion that Plaintiff was disabled, he nevertheless found "that the claimant has impairments that more than minimally impact her ability to engage in work related activities" but not to "the degree of impairment [that] renders her disabled." (TR at 26.)

[13]
 Dr. Baronovsky's medical records date from April 2012 through September 2013.  Dr. Carter's medical records span the period from October 2013 through May 2014.  Both doctors treated Plaintiff for a significant length of time.

[14]
 Dr. Baranovsky also routinely found Plaintiff to be oriented. (TR at 346, 353, 354.)

mood and affect.  She has reported that she feels better with medication, and has been noted to be 'bright' and to 'smile easily.'" (TR at 26.)   Further, Plaintiff was "frequently noted to be cooperative, engaged, friendly, and pleasant, with normal psychomotor activity, normal judgment and insight, normal thought process, normal content, and normal mod and affect." (TR at 25.) These findings are supported by Dr. Carter's treatment notes.  ALJ Carter also gave great weight to the assessments[15] made by Dr. Whitehorn and Dr. Duffy, finding both of them to be consistent with Plaintiff's mental status examinations and her improvement with conservative treatment. (TR at 26.)

ALJ Carter gave "more weight" to the opinion of Dr. Jaffe. (TR at 27.)  In doing so, the ALJ erred in stating that Dr. Jaffe's GAF score of 50 indicated "moderate symptoms or limitations in functioning" when it is undisputed that such a score is indicative of "serious symptoms."  This error is harmless.  "[A] GAF score is merely a 'snapshot opinion of one or more doctors as to an individual's level of social, psychological and occupational function at a specific point in time[,]' whereas '[a] determination of disability must be based on the entire record." *Schneider v. Colvin*, No. 3:13-CV-00790 MPS, 2014 WL 4269083, at *4 (D. Conn. Aug. 29, 2014) (internal citation omitted).  Here, the ALJ's decision contains a thorough analysis and is supported by medical evidence and opinions.  His reasons for discounting the opinion of Dr. Baranovsky are sufficient to apprise both Plaintiff and the Court of how this treating source opinion was evaluated. "Remand is not required where, as here, 'it can be ascertained from the entire record and the ALJ's opinion that the ALJ applied the substance of the treating physician rule."  *Bourinot*, 95 F. Supp.3d at 177 (quoting *Botta v. Barnhart*, 475 F. Supp.2d  174, 188 (E.D. N.Y. 2007) (internal citation omitted)).

---

[15]

Those assessments were also supportive of the RFC found by ALJ Carter. "The ALJ may rely on the opinions of non-examining sources to determine a claimant's RFC and need not to give greater weight to the opinions of treating physicians." *Crossley v. Colvin*, No. 13-cv-11427, 2015 WL 4512643, at *4 (D. Mass. July 24, 2015) (citing *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)).

There is substantial evidence in the record to support the ALJ's determination that the medical opinion of Dr. Baranovsky was not controlling.[16]

Sokolovskaya next argues that the ALJ's mental RFC failed to account for her limitations in concentration, persistence and pace that he found to exist.  This argument is unavailing.  As previously noted, the ALJ gave great weight to the opinions of Drs. Whitehorn and Duffy, both of whom opined that Plaintiff was able to maintain attention, pace and focus on simple tasks for two hour periods during the work day. (TR at 79-81; 91-3.)  In part, Plaintiff's RFC included a restriction "to performing no more than simple 1-4 step repetitive tasks." (TR at 24.)  When posing his hypothetical to the vocational expert, the ALJ stated:

> She suffers from anxiety and depression.  As a result of it, it's going to have an effect on her concentration at times, her memory, her attention to task, her ability to follow instructions, conform to changes in a work environment.  So to compensate, she would be restricted to performing no more than simple one-to four-step repetitive tasks.  She is not capable of performing complex tasks.

TR at 64.  The limitation to simple 1-4 step repetitive tasks in the RFC and hypothetical adequately covered Plaintiff's limitations in concentration, persistence and pace.[17] *See Dias v. Colvin*, 52 F. Supp. 3d 270, 284 (D. Mass. 2014) ("[T]he ALJ asked the VE whether or not plaintiff could work if she was 'limited to performing simple, routine, repetitive tasks.'. . . Another hypothetical asked the VE to assume that plaintiff was limited to being able to understand, remember simple information and perform simple tasks for a two hour time period. . . . The hypothetical questions

---

[16]

Because there was sufficient evidence upon which ALJ Carter could make the disability determination and there is no indication that the ALJ was unclear about Dr. Baranovsky's opinion, there was no reason for the ALJ to re-contact the doctor. *See*, e.g., *Green*, 588 F. Supp.2d at 155.

[17]

The vocational expert testified that the hypothetical person would work for two hours before she is given a break. (TR at 67.)

therefore adequately captured plaintiff's moderate difficulties with respect to concentration . . . The hypothetical questions also captured plaintiff's moderate difficulties in persistence and pace by asking the VE to assume that plaintiff could 'perform simple tasks' for a two hour time period. Limiting the hypothetical posed to the VE to being able to perform simple tasks thereby captures the ability to maintain persistence and pace for a two hour time period at work"); *Anderson v. Astrue*, 682 F. Supp.2d 89, 95 (D. Mass. 2010) ("In making his RFC assessment, the ALJ expressly acknowledged that Plaintiff had moderate difficulties in social functioning and concentration, persistence and pace but concluded nonetheless that, despite those restrictions, he was able to understand and remember simple instructions, concentrate on simple tasks and interact appropriately with co-workers.").  There is no error here.

## V. <u>CONCLUSION AND ORDER.</u>

For all the reasons stated, it is ORDERED that the Motion for an Order Reversing Commissioner's Decision (#14) be, and the same hereby, is DENIED.  It is FURTHER ORDERED that Defendant's Motion to Affirm the Commissioner (#16)  be, and the same hereby is, ALLOWED.  Judgment shall enter for Defendant.

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge

May 2, 2016.